# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EDWARD ORTIZ,                    :
    **Plaintiff**                 :
                                 :        **No. 1:23-cv-00315**
    **v.**                       :
                                 :        **(Judge Rambo)**
LEWIS MESSINGER,                 :
    **Defendant**                :

## MEMORANDUM

Before the Court is Defendant Lewis Messinger ("Defendant")'s motion to dismiss Plaintiff Edward Ortiz ("Plaintiff")'s complaint, filed pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. (Doc. No. 71.) Also before the Court are Plaintiff's motions for the appointment of counsel. (Doc. Nos. 75, 80.) For the reasons set forth below, the Court will grant in part and deny in part Defendant's motion to dismiss Plaintiff's complaint, and the Court will deny Plaintiff's motions for the appointment of counsel.

## I.    BACKGROUND

### A.    Procedural Background

Plaintiff is a former prisoner of the Federal Bureau of Prisons ("BOP"). On November 4, 2021, while he was housed at Federal Correctional Institution Williamsburg in Satters, South Carolina, he filed a pro se complaint in the United States District Court for the District of South Carolina ("District of South Carolina"). (Doc. No. 1.) On February 17, 2023, the District of South Carolina transferred

Plaintiff's action to this Court. (Doc. No. 61 (explaining that venue was improper in the District of South Carolina and that, instead, venue was proper in the United States District Court for the Middle District of Pennsylvania).)

After receiving the District of South Carolina's transfer order, the Court deemed Plaintiff's complaint filed and directed the Clerk of Court to, <u>inter alia</u>, serve a copy of the complaint, with a waiver of the service of summons, on Defendant. (Doc. No. 67.) On June 26, 2023, Defendant filed a waiver (Doc. No. 69), and, on August 28, 2023, after being granted an extension of time to respond to Plaintiff's complaint (Doc. Nos. 68, 70), Defendant filed a motion to dismiss pursuant to Rule 12(b) of the Federal Rules of Civil Procedure (Doc. No. 71), followed by a supporting brief (Doc. No. 79).

As reflected by the Court's docket, Plaintiff has not filed a brief in opposition to Defendant's motion to dismiss or sought an extension of time in which to do so. However, Plaintiff has filed two (2) motions seeking the appointment of counsel. (Doc. Nos. 75, 80.) Thus, it is based upon this procedural background that the parties' pending motions are ripe for the Court's resolution.

**B.    Factual Background**[1]

Plaintiff generally asserts that the events giving rise to his claims occurred while he was in BOP custody and housed at Low Security Correctional Institution Allenwood ("LSCI Allenwood") in White Deer, Pennsylvania.  (Doc. No. 1-5 at 5.)  In support, he alleges that, on September 29, 2018, he was notified by the Union B Unit officer (a non-party) to report to the recreation department for work.  (Id. at 5–6.)  Plaintiff, who asserts that he is a sincere adherent of Judaism (Doc. Nos. 1 at 4; 1-5 at 5), alleges that he explained to the officer that he is Jewish and that, because it was his "Sabbath day," he could not work "due to this day being holy" (Doc. No. 1-5 at 6).  Plaintiff contends that, despite this, the officer ordered him to report to work, and he "complied."  (Id.)

Plaintiff appears to allege that, when he reported to work, he reiterated that he could not work because it was "[his] Sabbath day."  (Id. at 6; Doc. Nos. 1 at 2; 1-1

_____

[1] Plaintiff's (5)-page handwritten complaint (Doc. No. 1), as docketed in the District of South Carolina, has the following documents attached to it: a thirteen (13)-page form complaint (Doc. No. 1-5), a handwritten exhibit concerning the allegations in his handwritten complaint and form complaint (Doc. No. 1-6), a BOP incident report (Doc. No. 1-1 at 1), administrative remedy documents that he filed with and/or received from the BOP concerning the incident report (Doc. Nos. 1-1 at 2–5; 1-2), a letter concerning the filings he submitted to the District of South Carolina (Doc. No. 1-3), envelopes (Doc. Nos. 1-4, 1-8), and certificates of service (Doc. No. 1-7).  Thus, the Court sets forth the factual background in this matter by recounting not only the allegations of Plaintiff's handwritten and form complaints ("complaint") but also by citing, when necessary, to the documentation that he has attached to his complaints.

at 1.)  He claims that he was then placed in the segregation housing unit ("SHU") "for refusing to work on the Holy Day of Sabbath."  (Doc. Nos. 1 at 2; 1-5 at 5; 1-6 at 1.)

Plaintiff, who does not set forth any specific factual allegations against Defendant in his complaint, claims that Defendant, as the Chaplain of LSCI Allenwood, violated his rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb-2000bb-4, as well as his rights under the First and Fifth Amendments to the United States Constitution pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) ("Bivens").  (Doc. No. 1-5 at 4 (alleging that Defendant violated his "constitutional right(s) to practice religious beliefs, by negligent conduct, lack of fiduciary duties, etc.").)  For these alleged violations, Plaintiff seeks monetary damages, with interest and costs, from Defendant.  (Doc. Nos. 1 at 3; 1-5 at 6 (stating that he "demands judgment against [Defendant] for the sum of $200,000, with interest and costs, for compensatory and punitive damages).)

Although Plaintiff has not included specific factual allegations against Defendant in his complaint, he has attached an Incident Report (i.e., Incident Report Number 3175442) concerning the alleged events of September 29, 2018.  (Doc. No. 1-1 at 1.)  Because this Incident Report provides context for Plaintiff's claims, the Court recounts the BOP staff member's description of the incident, as follows:

4

> On September 29, 2018, at approximately 2:55pm, I called Union B unit to locate [Plaintiff]. [Plaintiff] is on recreation shift 4 and was due to check in at 12:30pm. The unit officer called recreation and stated that [Plaintiff] was in the unit but it was a holiday and was exempt from coming to work. I called [Defendant] to verify [Plaintiff's] statement. [Defendant] stated that it wasn't a holiday and that [Plaintiff] was permitted to work this weekend. [Plaintiff] showed up to recreation and came to the office. I told [Plaintiff] it wasn't a holiday per [Defendant] and he was able to work. [Plaintiff] took off his lanyard and handed it to me and said, "I refuse to work. It is my Sabbath day and I am not working." I gave [Plaintiff] a direct order to do his job and he refused again. I called compound to come get [Plaintiff] . . . .

(Id.)

Ultimately, Plaintiff was charged with, and found guilty of, committing the following charges: Prohibited Act Codes 306 Refusing to Work; 311 Failing to Perform Work as Instructed by the Supervisor; and 316 Being in an Unauthorized Area. (Id.) He was sanctioned with a ninety (90)-day loss of commissary and TRULINCS privileges. (Id.) Plaintiff challenged his disciplinary proceeding through the BOP's administrative remedy process. As reflected by the administrative remedy documentation attached to his complaint, Plaintiff was able to secure an expungement of the Incident Report and sanctions from his disciplinary record. (Doc. Nos. 1-1; 1-2.)

In addition to the Incident Report, Plaintiff has also attached a handwritten exhibit to his complaint, wherein he provides additional allegations for his Bivens and RFRA claims. (Doc. No. 1-6.) More specifically, Plaintiff alleges that, after he

5

was placed in the SHU for refusing to work on his "Sabbath day," he asked the shift lieutenant to contact Defendant in order to verify the staff member's claim that Defendant had stated Plaintiff could work that day.  (<u>Id.</u> at 1.)  Plaintiff alleges that the shift lieutenant informed Plaintiff that he personally spoke with Defendant who confirmed that Plaintiff was able to work that day.  (<u>Id.</u>)  In connection with these allegations, Plaintiff contends that Defendant had a "pre-existing obligation to correct the wrong being informed of the latter incident."  (<u>Id.</u> (internal quotation marks omitted).)

Having set forth the factual background in this matter, the Court turns to the legal standard governing its disposition of the parties' pending motions.

## II.    LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 12(b)(1)

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack."  <u>Davis v. Wells Fargo</u>, 824 F.3d 333, 346 (3d Cir. 2016).  "A court ruling on a facial attack considers only the complaint, viewing it in the light most favorable to the plaintiff."  <u>Long v. SEPTA</u>, 903 F.3d 312, 320 (3d Cir. 2018) (citation omitted).  However, a court ruling on a factual attack, wherein the defendant contests the truth of the jurisdictional allegations, "is a different matter: the court need not treat the allegations as true[.]"  <u>See</u> <u>id.</u> (citations omitted).

"In reviewing a factual attack, the court may consider evidence outside the pleadings." Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000) (citation omitted).  Indeed, "[b]ecause at issue in a factual 12(b)(1) motion is the trial court's . . . very power to hear the case[,] there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  In other words, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  See id.

### B.    Federal Rule of Civil Procedure 12(b)(6)

In order to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  And a claim is plausible on its face when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  See Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

When considering a Rule 12(b)(6) motion, the court "accept[s] as true all well-pled factual allegations in the complaint and all reasonable inferences that can be

drawn from them." See Taksir v. Vanguard Grp., 903 F.3d 95, 96-97 (3d Cir. 2018) (citation and internal quotations omitted). The court also construes the factual allegations "in the light most favorable to the plaintiff[.]" See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010) (citation and internal quotations omitted). The court, however, is not required to credit "conclusions of law" or to draw "unreasonable factual inferences." See Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc., 450 F.3d 130, 133 (3d Cir. 2006).

Additionally, the United States Court of Appeals for the Third Circuit ("Third Circuit") has outlined a three-step process to determine whether a complaint meets the pleading standard established by Twombly and Iqbal. See Connelly v. Lane Const. Corp., 809 F.3d 780, 787 (3d Cir. 2016). First, the court "must 'tak[e] note of the elements [the] plaintiff must plead to state a claim.'" See id. (quoting Iqbal, 556 U.S. at 675) (alterations in original). Second, the court "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" See id. (quoting Iqbal, 556 U.S. at 679). And, third, "'[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" See id. (quoting Iqbal, 556 U.S. at 679).

## III.   DISCUSSION

### A.   Defendant's Motion to Dismiss

Defendant has filed a motion to dismiss on multiple grounds under Rule 12(b) of the Federal Rules of Civil Procedure.  (Doc. Nos. 71, 79.)  Plaintiff has not filed a response to Defendant's motion and, thus, is deemed not to oppose the motion under the Local Rules of this Court.  See M.D. Pa. L.R. 7.6 (stating as follows: "Any party opposing any motion, other than a motion for summary judgment, shall file a brief in opposition within fourteen (14) days after service of the movant's brief, or, if a brief in support of the motion is not required under these rules, within seven (7) days after service of the motion. Any party who fails to comply with this rule shall be deemed not to oppose such motion") (emphasis added)). That said, the Court has conducted an independent and thorough review of this matter. For the reasons discussed below, the Court will grant in part and deny in part Defendant's motion.

### 1.   Plaintiff's Official Capacity Claims

Defendant argues that the Plaintiff's Bivens claim against him in his official capacity is barred by sovereign immunity.  (Doc. No. 79 at 16–18.)  The Court agrees.  "The United States, 'as a sovereign, is immune from suit unless it consents to be sued.'"  S.R.P. ex rel. Abunabba v. United States, 676 F.3d 329, 332 (3d Cir. 2012) (quoting Merando v. United States, 517 F.3d 160, 164 (3d Cir. 2008)); see FDIC v. Meyer, 510 U.S. 471, 475 (1994) (stating that, "[a]bsent a waiver, sovereign

immunity shields the Federal Government and its agencies from suit" (citations omitted)).  In addition, "[a]n action against government officials in their official capacities constitutes an action against the United States [and is] barred by sovereign immunity, absent an explicit waiver."  See Lewal v. Ali, 289 F. App'x 515, 516 (3d Cir. 2008) (unpublished) (citing FDIC, 510 U.S. at 483); Hairston v. Miller, 646 F. App'x 184, 187 (3d Cir. 2016) (unpublished) (concluding that, to the extent the former federal prisoner "sought monetary damages against the defendants in their official capacities, dismissal of those claims based on sovereign immunity was proper" (citations omitted)).

Applying these principles here, the Court observes that Bivens does not waive sovereign immunity with regard to claims brought against government officials sued in their official capacities.  See Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 72 (2001) (explaining that, "[i]f a federal prisoner in a BOP facility alleges a constitutional deprivation, he may bring a Bivens claim against the offending individual officer, subject to the defense of qualified immunity[,]" but "[t]he prisoner may not bring a Bivens claim against the officer's employer, the United States, or the BOP"); see also Tucker v. Sec'y of Health & Human Servs., 588 F. App'x 110, 115 (3d Cir. 2014) (unpublished) (concluding that "a Bivens action cannot be maintained against a federal official in her official capacity since such an action would essentially be one against the United States").  Thus, Plaintiff's Bivens claim against Defendant

for damages in his official capacity is barred by sovereign immunity and will, therefore, be dismissed for lack of jurisdiction.

Additionally, although it appears that the United States Supreme Court and the Third Circuit have not yet addressed the applicability of sovereign immunity to official-capacity RFRA claims, several Courts of Appeals have considered the issue and concluded that RFRA does not waive sovereign immunity with regard to claims brought against government officials sued in their official capacities.  See Davila v. Gladden, 777 F.3d 1198, 1210 (11th Cir. 2015), cert. denied sub nom. Davila v. Haynes, 577 U.S. 820 (2015), (concluding that "Congress did not unequivocally waive [the government's] sovereign immunity in passing RFRA[,]" and, therefore, "RFRA does not . . . authorize suits for money damages against officers in their official capacities"); Oklevueha Native Am. Church of Hawaii, Inc. v. Holder, 676 F.3d 829, 840 (9th Cir. 2012) (holding that "RFRA does not waive the federal government's sovereign immunity from damages"); Webman v. Fed. Bureau of Prisons, 441 F.3d 1022, 1026 (D.C. Cir. 2006) (finding that "RFRA does not waive the federal government's sovereign immunity for damages"); see also Tanzin v. Tanvir, 592 U.S. 43, 52 (2020) (holding that damages are available for RFRA claims against federal officers in their individual capacities, but emphasizing that this analysis was limited to "a suit against individuals, who do not enjoy sovereign immunity" (emphasis added)); Mack v. Warden Loretto FCI, 839 F.3d 286, 302 n.92

(3d Cir. 2016) (noting that it need not address the federal government's sovereign immunity to suits for damages because the plaintiff brought his RFRA claim against federal officers only in their individual capacities, but citing to <u>Davila</u>, 777 F.3d at 1210 for the proposition that RFRA does not allow suits for damages against federal officials in their official capacities). Thus, Plaintiff's RFRA claim against Defendant for damages in his official capacity is barred by sovereign immunity and will, therefore, be dismissed for lack of jurisdiction.

### 2.   Plaintiff's Individual Capacity Claims

#### a.   <u>Bivens</u>

Defendant argues that Plaintiff's <u>Bivens</u> claim against him in his individual capacity for violations of the First and Fifth Amendments are foreclosed by Supreme Court precedent. (Doc. No. 79 at 21–35.) The Court agrees and begins its discussion with an overview of <u>Bivens</u>.

"In 1871, Congress passed a statute that was later codified at Rev. Stat. § 1979, 42 U.S.C. § 1983." <u>Ziglar v. Abbasi</u>, 582 U.S. 120, 130 (2017) ("<u>Abbasi</u>"). This statute "entitles an injured person to money damages if a state official violates his or her constitutional rights." <u>See id.</u> Congress, however, "did not create an analogous statute for federal officials." <u>See id.</u> In other words, Congress did not provide a money damages remedy for persons whose constitutional rights were violated by federal officials. <u>See id.</u>

One-hundred (100) years later in 1971, the United States Supreme Court ("Supreme Court") decided Bivens.  See id.  In that case, the Supreme Court held that there is an implied cause of action for money damages when a federal official, acting under color of his authority, violates the Fourth Amendment's prohibition against unreasonable searches and seizures.  See Xi v. Haugen, 68 F.4th 824, 832 (3d Cir. 2023) ("Haugen"). The Supreme Court recognized that "the Fourth Amendment does not in so many words" provide for an award of money damages as a consequence of its violation, but nevertheless explained that, "where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." See Bivens, 403 U.S. at 396 (citation and internal quotation marks omitted).

In the decade following Bivens, the Supreme Court implied a cause of action for money damages pursuant to Bivens in two (2) other contexts: one under the Fifth Amendment's Due Process Clause for gender discrimination in the employment context, see Davis v. Passman, 442 U.S. 228, 248–49 (1979); and the other under the Eighth Amendment's Cruel and Unusual Punishment Clause in the prison medical care context, see Carlson v. Green, 446 U.S. 14, 23–25 (1980). See Haugen, 68 F.4th at 832.

In 2017, however, the Supreme Court "made clear" in Abbasi that any further expansion of Bivens "is now a disfavored judicial activity." See Abbasi, 582 U.S.

at 135 (citation and internal quotation marks omitted); Hernandez v. Mesa, 140 S. Ct. 735, 741 (2020) (explaining that, after the Supreme Court's decisions in Davis and Carlson, "the Court changed course"); Mack v. Yost, 968 F.3d 311, 318 (3d Cir. 2020) (explaining that "the Supreme Court has consistently refused to expand Bivens actions beyond these three specific contexts"—i.e., Bivens, Davis, and Carlson (footnote omitted)).

Thus, in order to curb any further expansion of Bivens, the Supreme Court has established a rigorous two (2)-part inquiry for courts to follow when determining whether a Bivens action should be extended to a new context. See Haugen, 68 F.4th at 833. Courts must first determine "whether a case presents a new Bivens context" by asking "[i]f the case is different in a meaningful way from previous Bivens cases decided by [the Supreme] Court[.]" See Abbasi, 582 U.S. at 139. And if the case presents a new Bivens context, then courts must next determine whether any special factors counsel hesitation in allowing an expansion of the doctrine. See Haugen, 68 F.4th at 833. Such factors include:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider.

See Abbasi, 582 U.S. at 140.

More recently, however, on June 8, 2022, the Supreme Court decided <u>Egbert</u> <u>v. Boule</u>, 596 U.S. 482 (2022).   In that case, the Supreme Court clarified the framework that courts are to use before implying a cause action for money damages in a new <u>Bivens</u> context.  The Supreme Court recognized its precedents that describe the two (2)-part inquiry, but explained that these two (2) parts "often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy."  <u>See</u> <u>id.</u> at 492.  The Supreme Court further explained that, "[i]f there is even a single reason to pause before applying <u>Bivens</u> in a new context, a court may not recognize a <u>Bivens</u> remedy."  <u>See</u> <u>id.</u> (citation and internal quotation marks omitted)).

Thus, the outcome of <u>Egbert</u> is, essentially, that extending a <u>Bivens</u> remedy to a new context will be unavailable in all but the most unusual of cases.  <u>See</u> <u>id.</u> (instructing that "[i]f there is a rational reason" to think that Congress is better equipped to create a damages remedy, "as it will be in most every case, . . . no <u>Bivens</u> action may lie").  In other words, the Supreme Court has "all but closed the door on <u>Bivens</u> remedies."  <u>See</u> <u>Dyer v. Smith</u>, 56 F.4th 271, 277 (4th Cir. 2022) (citation omitted); <u>Haugen</u>, 68 F.4th at 833 (explaining that, in the many years since <u>Bivens</u> was decided, "the Supreme Court has pulled back the reins to what appears to be a full stop and no farther").

15

Guided by this precedent, the Court turns to whether Plaintiff's <u>Bivens</u> claim presents a new context, and, if so, whether any special factors counsel against extending a <u>Bivens</u> remedy here.

### i.   New Context

As discussed above, Plaintiff asserts a <u>Bivens</u> claim against Defendant for alleged violations of the First and Fifth Amendments regarding his prison disciplinary proceeding and placement in the SHU.  (Doc. Nos. 1; 1-5.)  A <u>Bivens</u> claim arises in a new context when the case is "different in a meaningful way from previous <u>Bivens</u> cases decided" by the Supreme Court.  <u>See Abbasi</u>, 582 U.S. at 139.

Here, the Court finds that Plaintiff's <u>Bivens</u> claim "bear[s] little resemblance" to the three (3) <u>Bivens</u> claims that the Supreme Court "has approved in the past:" (1) a Fourth Amendment "claim against FBI agents for handcuffing a man in his own home without a warrant;" (2) a Fifth Amendment "claim against a Congressman for firing his female secretary;" and (3) an Eighth Amendment "claim against prison officials for failure to treat an inmate's asthma."  <u>See id.</u> at 140. (citations omitted).

Although the Supreme Court recognized a <u>Bivens</u> claim in a Fifth Amendment case arising from alleged gender-based discrimination in the federal employment context, <u>see Davis</u>, 442 U.S. at 248–49, Plaintiff's allegations concerning his prison disciplinary proceeding and placement in the SHU are factually different from the gender discrimination context in <u>Davis</u>.  Similarly, although the Supreme Court also

16

recognized a <u>Bivens</u> claim in the prison context for inadequate medical care under the Eighth Amendment, <u>see</u> <u>Carlson</u>, 446 U.S. at 23–25, Plaintiff's claim is not only factually different from the medical care context in <u>Carlson</u>, but it is also legally distinguishable because it arises under different constitutional provisions, <u>i.e.</u>, the First and Fifth Amendments and not the Eighth Amendment. Thus, while Plaintiff's case arguably shares broad similarities with <u>Davis</u> and <u>Carlson</u>, such broad similarities will be insufficient to support the Court extending a <u>Bivens</u> remedy to this new context.  <u>See</u> <u>Egbert</u>, 596 U.S. at 495 (explaining that "almost parallel circumstances" or "superficial similarities" with <u>Bivens</u>, <u>Davis</u>, and <u>Carlson</u> "are not enough to support the judicial creation of a cause of action" (citation and internal quotation marks omitted)).

Accordingly, for all of these reasons, the Court concludes that Plaintiff's <u>Bivens</u> claim against Defendant for alleged violations of the First and Fifth Amendments regarding his prison disciplinary proceeding and placement in the SHU arises in a new context.

### ii.    Special Factors

Because Plaintiff's <u>Bivens</u> claim arises in a new context, the Court must determine under <u>Abbasi</u> and <u>Egbert</u> whether there are any special factors that counsel hesitation in the Court extending a <u>Bivens</u> remedy to such claims.  As explained by the Supreme Court, a special factor suggests that Congress is better equipped than

the Judiciary to "weigh the costs and benefits" of creating a new damages remedy. See Egbert, 596 U.S. at 492 (citation and internal quotation marks omitted).  If "there is any rational reason (even one) to think that Congress is better suited to 'weigh the costs and benefits of allowing a damages action to proceed[,]'" then the Court cannot imply a cause of action for damages under Bivens.  See id. at 496 (emphasis in original) (citation and internal quotation marks omitted).

Here, the Court finds that there are special factors that weigh against extending a Bivens remedy to Plaintiff's claim for alleged violations of his First and Fifth Amendment rights.  More specifically, the Court finds that the BOP's Administrative Remedy Program, which Plaintiff utilized here, provides an alternative process for addressing Plaintiff's claims.  See Malesko, 534 U.S. at 68 (holding that "administrative review mechanisms" can provide "meaningful redress and thereby forelose[ ] the need to fashion a new, judicially crafted cause of action[,]" even if those mechanisms do not "fully remedy the constitutional violation . . . "); Egbert, 596 U.S. at 493, 497 (explaining that the availability of alternative remedies, such as a grievance procedure, is sufficient to foreclose Bivens and that  it does not matter that existing remedies do not provide complete relief); see also 28 C.F.R. § 542.10(a) (providing that "[t]he purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement").

The Court further finds that RFRA also provides a potential alternative remedy to Plaintiff.  See Davis v. Samuels, 962 F.3d 105, 113 (3d Cir. 2020); see also Abassi, 582 U.S. at 137 (explaining that, "if Congress has created any alternative, existing process for protecting the [injured party's] interest that itself may amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages") (alterations in original) (internal quotation marks omitted)); Mack, 839 F.3d at 305 (declining to extend Bivens to the prisoner-plaintiff's claim that prison officers violated his First Amendment right to freely exercise his religion since there was an alternative remedial structure available to the plaintiff under the broad religious protections of RFRA).

The Supreme Court has explained that such alternative remedies for aggrieved parties "independently foreclose a Bivens action[.]" See Egbert, 596 U.S. 497 (explaining that "court[s] may not fashion a Bivens remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure" and that, "[i]f there are alternative remedial structures in place, that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a new Bivens cause of action" (citation and internal citations and quotation marks omitted)); see also Malesko, 534 U.S. at 69 (stating that, "[s]o long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers

foreclosed judicial imposition of a new substantive liability" (citation omitted)). Accordingly, "when alternative methods of relief are available," as they are here, "a Bivens remedy usually is not." See Abbasi, 582 U.S. at 145.

In addition, the Court finds that "the Judiciary is not undoubtedly better positioned than Congress to authorize a damages action" in the context of disciplinary proceedings in federal prisons. See Egbert, 596 U.S. 492. Indeed, the Supreme Court has generally acknowledged that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform[,]" that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government[,]" and that this "task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint." See Turner v. Safley, 482 U.S. 78, 84–85 (1987) (emphasis added) (internal citation and internal quotation marks omitted). Thus, extending a Bivens remedy to this new context "would step well into the lawmaking privilege delegated only to Congress, and well over the bounds of [the Court's] limited constitutional power." See Mammana v. Barben, 856 F. App'x 411, 415 (3d Cir. 2021) (unpublished) (setting forth this principle in the context of a Bivens claim based upon allegedly unconstitutional conditions of confinement in violation of the Eighth Amendment).

Furthermore, the Court finds that Congress's enactment of the Prison Litigation Reform Act ("PLRA") counsels hesitation in extending <u>Bivens</u> to Plaintiff's claims.  Indeed, "[s]ome 15 years after <u>Carlson</u> was decided, Congress passed the [PLRA], which made comprehensive changes to the way prisoner abuse claims must be brought in federal court."  <u>See</u> <u>Abbasi</u>, 582 U.S. at 148 (citing 42 U.S.C. § 1997).  As a result, Congress "had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs[,]" but deliberately chose to "not provide for a standalone damages remedy against federal jailers."  <u>See id.</u> at 149. This "legislative action suggest[s] that Congress does not want a damages remedy is itself a factor counseling hesitation" against extending a <u>Bivens</u> remedy to Plaintiff's claim.  <u>See id.</u> at 148; <u>see also</u> <u>Davis</u>, 962 F.3d at 112 (stating that "Congress's post-<u>Bivens</u> promulgation of the [PLRA]" suggests that Congress does not want a damages remedy).

And, finally, the Court recognizes the reasoning of <u>Abbasi</u> that "[i]t is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others."  <u>See</u> <u>Abbasi</u>, 582 U.S. at 136.  Indeed, while "[i]t is true that, if equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations[,] the decision to recognize a damages remedy requires an assessment of

its impact on governmental operations systemwide." See id.  Such an assessment "include[s] the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies." See id.  These concepts "may make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case." See id. at 136–37.

Thus, for all of these reasons, the Court concludes that special factors counsel hesitation in extending a Bivens remedy to Plaintiff's claim for violations of his rights under the First and Fifth Amendments.  See Egbert, 596 U.S. at 486 (stating that Supreme Court precedent has "made clear that, in all but the most unusual circumstances," a Bivens remedy should not be recognized in new contexts). Accordingly, Plaintiff's Bivens claim against Defendant in his individual capacity will be dismissed.

### b.    RFRA

Defendant argues that he is entitled to qualified immunity on Plaintiff's individual capacity RFRA claim because Plaintiff has not adequately pleaded Defendant's personal involvement in any alleged RFRA violation and because the law regarding the alleged violation was not clearly established at the time of that alleged violation.  (Doc. No. 79 at 35–42.)  The Court, however, is unpersuaded.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Clark v. Coupe, 55 F.4th 167, 178 (3d Cir. 2022) (citations omitted). This doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Mack v. Yost, 63 F.4th 211, 221 (3d Cir. 2023) (citing Peroza-Benitez v. Smith, 994 F.3d 157, 164 (3d Cir. 2021)).

In determining whether officials are entitled to qualified immunity, courts "engage in a two-part analysis: (1) whether the plaintiff sufficiently alleged a right had been violated, and (2) whether that right was clearly established when it was allegedly violated to the extent that it would have been clear to a reasonable person that his conduct was unlawful." See Clark, 55 F.4th at 178 (citation and internal quotation marks omitted); Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (explaining that qualified immunity shields federal and state officials unless a plaintiff pleads facts satisfying these two (2) prongs).

Under the first prong, courts "must define the right allegedly violated at the appropriate level of specificity." See Peroza-Benitez, 994 F.3d at 165 (citation and internal quotation marks omitted); Mack, 63 F.4th at 227 (stating that, under the first

23

prong, the inquiry is "whether the facts, as viewed in the light most favorable to the plaintiff, show the violation of a legal right" (citation omitted)).  This prong requires courts "to frame the right in light of the specific context of the case, not as a broad general proposition."  See Peroza-Benitez, 994 F.3d at 165 (citations and quotation marks omitted); Tolan v. Cotton, 572 U.S. 650, 657 (2014) (instructing that "courts should define the clearly established right at issue on the basis of the specific context of the case" (citations and internal quotation marks omitted)).

Under the second prong, courts "must ask whether that right was clearly established at the time of its alleged violation, i.e., whether the right was sufficiently clear that a reasonable official would understand that what he is doing violates that right."  See Peroza-Benitez, 994 F.3d at 165 (citations and internal quotation marks omitted).  In other words, "[g]overnmental actors are shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  See Tolan, 572 U.S. at 656.

This second prong "is an "objective (albeit fact-specific) question, where [the defendants'] subjective beliefs . . . are irrelevant."  See Peroza-Benitez, 994 F.3d at 165 (citations and internal quotation marks omitted).  Thus, in order to determine whether the right was clearly established at the time of its alleged violation, courts must first look "to factually analogous Supreme Court precedent, as well as binding

opinions from [the Third Circuit Court of Appeals[.]" See id. (citation omitted). Courts must next "consider whether there is a robust consensus of cases of persuasive authority in the Courts of Appeals." See id. (citations and internal quotation marks omitted). Additionally, courts "may also take into account district court cases, from within the Third Circuit or elsewhere." See id. at 165–66 (citations omitted).

In assessing such case law, courts "must keep in mind that [the Third Circuit] takes a broad view of what constitutes an established right of which a reasonable person would have known." See id. at 166 (citations and internal quotation marks omitted). In fact, "a right may be clearly established even without a precise factual correspondence between the case at issue and a previous case." See id. (citations and internal quotation marks omitted); Ashcroft, 563 U.S. at 741 (explaining that, even though "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate" (citations omitted)). Thus, "[a] public official does not get the benefit of 'one liability-free violation' simply because the circumstance of his case is not identical to that of a prior case." See Peroza-Benitez, 994 F.3d at 166 (quoting Kopec v. Tate, 361 F.3d 772, 778 (3d Cir. 2004)).

In addition, the burden of establishing qualified immunity lies with defendants. See Reedy v. Evanson, 615 F.3d 197, 223 (3d Cir. 2010). Defendants

25

satisfy this burden "only if they can show that a reasonable person in their position at the relevant time could have believed, in light of clearly established law, that their conduct comported with recognized legal standards." See E. D. v. Sharkey, 928 F.3d 299, 306 (3d Cir. 2019) (citation omitted). And, finally, although the issue of qualified immunity should be resolved "at the earliest possible stage" in the litigation, see Hunter v. Bryant, 502 U.S. 224, 227 (1991) (collecting cases), "qualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint." See Thomas v. Indep. Twp., 463 F.3d 285, 291 (3d Cir. 2006) (citation and internal quotation marks omitted).

As set forth above, Defendant argues that he is entitled to qualified immunity on Plaintiff's individual-capacity RFRA claim. (Doc. No. 79 at 35–42.) RFRA, which was passed by Congress in 1993, Pub. L. No. 103-141, § 2, 107 Stat. 1488, mandates that the "'[g]overnment shall not substantially burden a person's exercise of religion . . . [unless] it demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" See Mack, 63 F.4th at 222 (quoting 42 U.S.C. § 2000bb-1(a)-(b)).

RFRA defines "exercise of religion" to mean "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." See 42 U.S.C. § 2000bb-2(4) (incorporating the Religious Land Use and Institutionalized

26

Persons Act's definition for "religious exercise," <u>see</u> 42 U.S.C. § 2000cc-5(7), as the definition of "exercise of religion" for RFRA).  "A person whose religious exercise has been burdened in violation of [RFRA]" can sue to "obtain appropriate relief[.]'" <u>See</u> 42 U.S.C. § 2000bb-1(c).  However, qualified immunity is "a limit on the scope of relief under RFRA."  <u>See</u> <u>Mack</u>, 63 F.4th at 227 (holding that the defense of qualified immunity is available to a public official sued in his individual capacity under RFRA).

Thus, in order for Plaintiff to establish a prima facie case under RFRA, his complaint must allege "that the government (1) substantially burdened (2) a sincere (3) religious exercise."  <u>See</u> <u>Mack</u>, 63 F.4th at 227; <u>Davis v. Wigen</u>, 82 F.4th 204, 211 (3d Cir. 2023) (explaining that, at the pleadings stage, courts consider "whether the plaintiff has plausibly alleged each element of his prima facie case[,]" but at the summary judgment stage, "if the plaintiff makes an initial showing that the defendant substantially burdened his sincere religious exercise, then the burden shifts to the defendant to show that the offending policy is the least restrictive means of achieving a compelling government interest" (citations and internal citation omitted)).

Liberally construed, Plaintiff's complaint alleges that he is a sincere adherent of Judaism (Doc. Nos. 1 at 4; 1-5 at 5) and that his observance of the Sabbath constitutes religious exercise (Doc. No. 1-5 at 6). Defendant does not appear to

dispute that Plaintiff sincerely adheres to his faith or that his observance of the Sabbath constitutes religious exercise.  Defendant does dispute, however, whether Plaintiff alleges that he had personal involvement in any alleged violation of Plaintiff's rights under RFRA—i.e., whether Defendant substantially burdened any religious exercise.  And, in support, Defendant argues that his personal involvement "was limited to responding to questioning by other prison personnel."  (Doc. No. 79 at 38.)  As a result, Defendant argues that he did not have any involvement "in issuing discipline" to Plaintiff for refusing to work, including placing Plaintiff in the SHU.  (Id. at 38–39.)

It is well-established that, in order to recover from a defendant in a civil rights case, a plaintiff must allege how the defendant was personally involved in conduct amounting to a violation of a federal constitutional or statutory right.  See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) (stating that "[b]ecause vicarious liability is inapplicable to Bivens and [42 U.S.C. § 1983], a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); Sutton v. Rasheed, 323 F.3d 236, 249 (3d Cir. 2003) (explaining that, in a civil rights action, a plaintiff must show that the defendant had "personal involvement in the alleged wrongs to be liable" (citation and internal quotation marks omitted)).  Assuming this principle applies, here, to Plaintiff's

RFRA claim,[2] the Court finds that Plaintiff's complaint and exhibits attached to his complaint raise issues of fact concerning the extent of Defendant's personal involvement in the alleged violation of Plaintiff's rights under RFRA.

Plaintiff's complaint alleges that he was disciplined for refusing to work on the Holy Day of Sabbath. In support of this allegation, he has attached the BOP Incident Report (i.e., Number 3175442) to his complaint as an exhibit. (Doc. Nos. 1 at 2; 1-1 at 1.) As reflected by the description section of this Incident Report, the BOP staff member explains that he spoke with Defendant in order to verify Plaintiff's statement (i.e., that it was a "holiday" and that he was "exempt from coming to work") and that Defendant "stated that it wasn't a holiday and that [Plaintiff] was permitted to work this weekend." (Doc. No. 1-1 at 1.) The staff

---

[2] See, e.g., Daley v. Lappin, 555 F. App'x 161, 167–68 (3d Cir. 2014) (unpublished) (concluding that the plaintiff failed to show the personal involvement of the director of the BOP in the alleged violations of plaintiff's rights under, inter alia, RFRA); see also Tanzin v. Tanvir, 592 U.S. 43, 48 (2020) (drawing similarities between RFRA and 42 U.S.C. § 1983 and noting that "[b]ecause RFRA uses the same terminology as § 1983 in the very same field of civil rights law, it is reasonable to believe that the terminology bears a consistent meaning" (citation and internal quotation marks omitted)); Patel v. Bureau of Prisons, 125 F. Supp. 3d 44, 55–56 (D.D.C. 2015) (concluding that "pure vicarious liability—that is, liability of supervisors based solely on the acts of their subordinates—is not sufficient to state a claim under RFRA" because "Congress legislated in relevant respects against the more relevant background of constitutional litigation under Bivens and § 1983" and "RFRA does not by its terms authorize a further step away from the background of § 1983 and Bivens precedents to impose vicarious liability . . . ").

member further explains that he "told [Plaintiff] it wasn't a holiday per [Defendant] and he was able to work."  (Id.)

While the Court understands Defendant's argument that Plaintiff's complaint does not allege that Defendant was the one who issued the Incident Report or imposed sanctions, the Court observes that Defendant (as the Chaplain of LSCI Allenwood at the time) informed the staff member who issued the Incident Report that Plaintiff could work on September 29, 2018.  The Court also observes that in a document attached to the complaint, Plaintiff explains that: while he was housed in the SHU, he requested the shift lieutenant to verify the staff member's claim that he had spoken with Defendant about the situation; and the shift lieutenant informed Plaintiff that he had personally spoken with Defendant who confirmed that Plaintiff was able to work that day.  (Doc. No. 1-6 at 1.)

Thus, while it cannot be said, based upon the record before the Court, that Defendant was the one who issued the Incident Report or sanctions imposed, there are—at the very least— issues of fact as to whether Defendant had actual knowledge of Plaintiff's Incident Report and/or sanctions such that he acquiesced in the issuance of the Incident Report and/or sanctions by failing to address the alleged wrongdoing. See Chavarriaga v. New Jersey Dep't of Corr., 806 F.3d 210, 222 (3d Cir. 2015) (explaining that "[a] plaintiff makes sufficient allegations of a defendant's personal involvement by describing the defendant's participation in or actual knowledge of

and acquiescence in the wrongful conduct" (citing <u>Rode</u>, 845 F.2d at 1207); <u>Dooley</u> <u>v. Wetzel</u>, 957 F.3d 366, 374 (3d Cir. 2020) (stating that "[p]ersonal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence'" (quoting <u>Rode</u>, 845 F.2d at 1207)); <u>see also</u> (Doc. No. 1-6 at 1 (containing Plaintiff's handwritten exhibit wherein he asserts that Defendant had an "obligation to correct the wrong . . . ").

The Court finds that these issues of fact are only muddied further by the BOP administrative remedy documentation that Plaintiff has attached to his complaint. This documentation reveals that Plaintiff was successful in winning an expungement of the Incident Report and the sanctions imposed. (Doc. No. 1-2 at 2, 5.) However, this documentation does not fully explain why Plaintiff was successful; rather, it only states that "[a] thorough review of the record reveals questions concerning the disciplinary process." (<u>Id.</u> at 2.)

Thus, for all of these reasons, the Court concludes that there are issues of fact concerning the precise extent of Defendant's involvement in the alleged violation of Plaintiff's rights under RFRA. As such, the parties should be afforded time to conduct discovery and to fully develop the record in this matter. Until the record is fully developed, the Court concludes that Defendant's qualified immunity defense on Plaintiff's RFRA claim is not properly before the Court. See <u>Grant v. City of</u> <u>Pittsburgh</u>, 98 F.3d 116, 122 (3d Cir. 1996) (recognizing that the need to decide

qualified immunity issues early in the litigation can conflict with "the reality" that factual disputes frequently need to be resolved in order to determine whether the defendant's conduct violated a clearly established constitutional or statutory right (citation omitted)); Thomas, 463 F.3d at 291 (stating that "qualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint" (citation and internal quotation marks omitted)). Defendant, of course, may reassert this argument in a motion for summary judgment.

### B.     Plaintiff's Motions for the Appointment of Counsel

Plaintiff has filed two (2) motions seeking the appointment of counsel. (Doc. Nos. 75, 80.) In support, Plaintiff asserts that he is unemployed and has no income and, therefore, is unable to afford counsel. (Doc. Nos. 75 at 2; 80 at 1–3.) Plaintiff also asserts that he is unaware of the laws governing this case (Doc. Nos. 75 at 2; 80 at 5) and that the halfway house where he currently resides only has "three (3) out of four (4) computers working for fifty-six (56) inmates/residence" (Doc. No. 75 at 1). For the reasons discussed below, the Court will deny Plaintiff's motion for the appointment of counsel.

The Court begins its discussion with the basic principle that, although indigent civil litigants have no constitutional or statutory right to the appointment of counsel, district courts have broad discretionary power to request appointed counsel for such litigants pursuant to 28 U.S.C. § 1915(e)(1). See Montgomery v. Pinchak, 294 F.3d

492, 498 (3d Cir. 2002) (citations omitted).  The Third Circuit has "outlined a two-step process" that district courts are to follow when deciding whether to request appointed counsel to represent an indigent civil litigant.  See Houser v. Folino, 927 F.3d 693, 697 (3d Cir. 2019).

First, as a threshold inquiry, the district court must consider whether the plaintiff's case has some arguable merit in fact and law.  See Montgomery, 294 F.3d at 498–99 (citations omitted).  Second, if the district court determines that the plaintiff's case has some arguable merit in fact and law, then the district court is to consider other factors, including: (1) the plaintiff's ability to present his own case; (2) the complexity of the legal issues; (3) the degree to which factual investigation will be required and the plaintiff's ability to pursue such investigation; (4) the extent to which the case is likely to turn on credibility determinations; (5) whether the case will require testimony from expert witnesses; and (6) whether the plaintiff can attain and afford counsel on his own behalf.  See Houser, 927 F.3d at 697 (citations omitted).

This list, however, "is not meant to be exhaustive."  See Tabron v. Grace, 6 F.3d 147, 157 (3d Cir. 1993); see also Houser, 927 F.3d at 700 (stating that "[w]e have always emphasized that [these] factors are only a guidepost for district courts in their exercise of the broad statutory discretion granted to them by Congress[,] and that "[t]hey are not exhaustive, nor are they each always essential").  Rather, the

district court must determine on a case-by-case basis whether a request for appointed counsel is warranted.  See Tabron, 6 F.3d at 157–58.

Having reviewed Plaintiff's motion, the Court concludes that the appointment of counsel is not warranted at this time.  Under the two (2)-step process outlined above, the Court must consider whether Plaintiff's case has some arguable merit in fact and law and, if so, whether the pertinent factors warrant the appointment of counsel.  See Houser, 927 F.3d at 697.

Here, even assuming arguendo that Plaintiff's individual capacity RFRA claim has some arguable merit, the Court would still deny his motion seeking the appointment of counsel.  Indeed, the record reflects that Plaintiff has been able to litigate this action pro se, as illustrated by the filing of, inter alia, his complaint, the various supporting documentation attached to his complaint, and his instant motions seeking the appointment of counsel. Finally, with respect to Plaintiff's representation that he has limited access to the computers at the halfway house where he currently resides, the Court informs Plaintiff that he need only request an extension of time from the Court in order to have sufficient time to respond to future filings and/or Orders, which would require a response from him.

Accordingly, given the Court's duty to liberally construe Plaintiff's pro se pleadings, see Riley v. Jeffes, 777 F.2d 143, 147–48 (3d Cir. 1985), coupled with his apparent ability to litigate this action, the Court concludes that the appointment

of counsel is not warranted at this time.  In the event that future proceedings would otherwise demonstrate the need for counsel, then the Court may reconsider this matter either <u>sua</u> <u>sponte</u> or upon a motion properly filed by Plaintiff.

## IV.   CONCLUSION

Accordingly, for all of the foregoing reasons, the Court will grant in part and deny in part Defendant's motion to dismiss.  (Doc. No. 71.)  In addition, the Court will deny Plaintiff's motions for the appointment of counsel.  (Doc. Nos. 75, 80.)


Dated:  March 26, 2024                    <u>s/ Sylvia H. Rambo</u>
                                          SYLVIA H. RAMBO
                                          United States District Judge